**No. 16-35376**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**GENE MᴄLENITHAN, Jʀ.,**

*Plaintiff-Appellant,*

**v.**

**MAX WILLIAMS, ᴇᴛ ᴀʟ,**

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Oregon
3:09-cv-00085-AC

_____

**APPELLANT'S OPENING BRIEF**
_____

Louis Fisher
Anthony J. Dick*
  *Counsel of Record*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
ajdick@jonesday.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................... viii

INTRODUCTION .................................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF THE ISSUES...........................................................3

STATEMENT OF THE CASE...............................................................4

    A.    Mr. McLenithan's Kosher Religious Practice......................4

    B.    Defendants' Discriminatory Policy.......................................6

    C.    The *Wofford* Decision and ODOC's Promise of a Change in Policy.....................................................................................9

    D.    This Litigation and ODOC's Broken Promise...................12

    E.    The Decision Below.............................................................15

SUMMARY OF THE ARGUMENT ...................................................19

STANDARD OF REVIEW .................................................................22

ARGUMENT .......................................................................................23

I.    Defendants' Discriminatory Conduct Violates The Constitution and RLUIPA .........................................................................................24

    A.    Strict Scrutiny Applies to Defendants' Discriminatory Exclusion of Mr. McLenithan From the Kosher Meal Program........24

        1.    Strict Scrutiny Applies Under the Free Exercise and Equal Protection Clauses ........................................25

        2.    Strict Scrutiny Applies Under RLUIPA .................32

    B.    Defendants' Discriminatory Policy Cannot Survive Strict Scrutiny................................................................................34

        1.    Religious Discrimination Is Not A Permissible Means of Controlling the Cost of Dietary Accommodations .................37

        2.    Defendants Cannot Prove That Their Discriminatory Policy Serves A "Compelling" Interest In Cost Control ........39

i

# TABLE OF CONTENTS
(continued)

**Page**

3.  Defendants Cannot Prove That Their Discriminatory Policy Is The "Least Restrictive Means" of Controlling Costs .......................................................................................47

II.  Defendants Are Not Entitled to Qualified Immunity For Their Flagrantly Unconstitutional Discrimination ................................................50

III. Mr. McLenithan Is Entitled to Summary Judgment Now ...........................53

CONCLUSION .................................................................................................55

STATEMENT OF RELATED CASES ................................................................56

CERTIFICATION OF COMPLIANCE ...............................................................57

CERTIFICATE OF SERVICE ............................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdulhaseeb v. Calbone,*
  600 F.3d 1301 (10th Cir. 2010) ........................................................34

*Am. Sugar-Ref. Co. v. State of Louisiana,*
  179 U.S. 89 (1900)..................................................................37, 54

*Ashelman v. Wawrzaszek,*
  111 F.3d 674 (9th Cir. 1997) ...........................................................28

*Baranowski v. Hart,*
  486 F.3d 112 (5th Cir. 2007) ...........................................................34

*Bass v. Coughlin,*
  976 F.2d 98 (2d Cir. 1992) ..............................................................52

*Beerheide v. Suthers,*
  286 F.3d 1179 (10th Cir. 2002) ..................................................47, 48

*Benning v. Georgia,*
  391 F.3d 1299 (11th Cir. 2004) ..................................................40, 41

*Boyd v. Benton County.,*
  374 F.3d 773 (9th Cir. 2004) ...........................................................50

*Carrillo v. County of Los Angeles,*
  798 F.3d 1210 (9th Cir. 2015) .........................................................50

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)...............................................................*passim*

*City of Boerne v. Flores,*
  521 U.S. 507 (1997)....................................................................35

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976) ........................................................................28

*Cotton v. Cate*,
    2012 WL 1094237 (N.D. Cal. Mar. 29, 2012) ..................................38

*Cruz v. Beto*,
    405 U.S. 319 (1972) ...................................................................38, 51

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ........................................................................47

*Employment Div., Dep't of Human Res. of Or. v. Smith*,
    494 U.S. 872 (1990) ............................................................25, 27, 28

*Freeman v. Arpaio*,
    125 F.3d 732 (9th Cir. 1997) ..............................................29, 37, 49

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ............................................................35, 39, 46

*Graham v. Richardson*,
    403 U.S. 365 (1971) ........................................................................40

*Hernandez v. Commissioner*,
    490 U.S. 680 (1989) ........................................................................25

*Holt v. Hobbs*,
    135 S. Ct. 853 (2015) ...............................................................*passim*

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ........................................................................50

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Jackson v. Mann*,
196 F.3d 316 (2d Cir. 1999) .......................................................26, 52

*Johnson v. Horn*,
150 F.3d 276 (3d Cir. 1998) ...................................................................52

*Jones v. Williams*,
791 F.3d 1023 (9th Cir. 2015) ..........................................................*passim*

*Makin v. Colorado Dep't of Corr.*,
183 F.3d 1205 (10th Cir. 1999) .............................................................52

*Massachusetts Bd. of Retirement v. Murgia*,
427 U.S. 307 (1976)............................................................................28

*McElyea v. Babbitt*,
833 F.2d 196 (9th Cir. 1987) .................................................................27

*Mem'l Hosp. v. Maricopa Cty.*,
415 U.S. 250 (1974)............................................................................40

*Perez-Gonzalez v. Ashcroft*,
379 F.3d 783 (9th Cir. 2004) .................................................................22

*Pit River Tribe v. U.S. Forest Service*,
469 F.3d 768 (9th Cir. 2006) .................................................................22

*Robinson v. Crutchfield*,
2014 WL 934548 (S.D. Ohio Mar. 10, 2014)....................................47

*Shakur v. Schriro*,
514 F.3d 878 (9th Cir. 2008) .........................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Shapiro v. Thompson*,
    394 U.S. 618 (1969)................................................................40

*Sherbert v. Verner*,
    374 U.S. 398 (1963)................................................................25

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981)................................................................26

*Turner v. Safley*,
    482 U.S. 78 (1987)............................................................17, 39

*United States v. Ballard*,
    322 U.S. 78 (1944)................................................................26

*United States v. Virginia*,
    518 U.S. 515 (1996)................................................................42

*Ward v. Walsh*,
    1 F.3d 873 (9th Cir. 1993) ......................................................28

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) ...................................33, 35, 46

*Whitney v. Brown*,
    882 F.2d 1068 (6th Cir. 1989) ................................................52

*Wofford v. Williams*,
    No. 07-CV-192-BR, 2008 WL 3871756 (D. Or. Aug. 20, 2008) .............*passim*

*Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove*,
    419 F.3d 925 (9th Cir. 2005) ..................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**STATUTES & CONSTITUTIONAL PROVISIONS**

28 U.S.C. § 636(c)(1).................................................................15

28 U.S.C. § 1291........................................................................3

28 U.S.C. § 1331........................................................................3

42 U.S.C. § 1983........................................................12, 50, 53

42 U.S.C. § 2000cc–1.................................................................32

42 U.S.C. § 2000cc-3.................................................................40

U.S. Const. amend. I.............................................................*passim*

U.S. Const. amend. VIII......................................................12, 17

U.S. Const. amend. XIV.......................................................*passim*

**OTHER AUTHORITIES**

Oregon Dept. of Corrections, 2015-17 Legislatively Adopted Budget...................41

Fed. R. App. P. 4......................................................................3

Mark A. Kellner, *The Jews of Adventism*,
ADVENTIST REVIEW...............................................................4

Pew Research Center, Summary Table:
Religious Composition of U.S. Adults ..........................................45

S. Rep. No. 103-111 (1993)........................................................48

Study Group on Religious Dietary Accommodation in Florida's State
Prison System, *Final Report*.................................................46

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant Gene A. McLenithan, Jr., respectfully requests oral argument, which will aid the Court's decisional process. This case presents novel and important legal questions involving the equal protection of the laws and the free exercise of religion under the United States Constitution and federal statutory law. In addition, as Defendants acknowledged in the court below, "the central question in this case implicates significant policy and operational issues" for the Oregon Department of Corrections, and "the outcome of this litigation will have an impact on inmates beyond [the] plaintiff." ER24. Mr. McLenithan submits that oral argument in this proceeding—in which his counsel appears pro bono—will assist the Court in addressing all of these significant issues.

## INTRODUCTION

This case involves a state prison and its officers who have restricted their inmates' religious practices for nearly two decades based on a policy that facially discriminates on the basis of religion. As the record reflects, the Oregon Department of Corrections provides kosher meals to traditionally Jewish inmates "upon request." But at the same time, it categorically denies the exact same kosher meals to Seventh-day Adventists and other "Christian Jewish" inmates who have their own sincere religious practice of maintaining a kosher diet based on their good-faith interpretation of the Old Testament.

The religious discrimination at issue in this case is as brazen as it is longstanding: As a consistent policy and practice over many years, Defendants have repeatedly stated that *regardless* of the sincerity of a non-Jewish inmate who seeks to observe a kosher diet, "[i]t is the department's policy that only Jewish adherents are approved for [the] Kosher diet," "Kosher Diets are only available for inmates of the Jewish faith," and "Jewish-Christian groups don't qualify." ER77, ER78, ER83. Astoundingly, Defendants even went so far in the court below as to justify their restriction of the Plaintiff's religious exercise because he "was not born Jewish and has never converted to Judaism," "he believes that Jesus Christ is his savior," and he "is not willing to renounce that belief." ER39.

1

Instead of striking down Defendants' discriminatory policy, the district court upheld it: The court acknowledged, as Defendants themselves have admitted, that the Plaintiff "has established his belief that he must eat a Kosher diet is sincerely held and is rooted in his religious beliefs as a Seventh Day Adventist." ER10. But nonetheless, the court accepted Defendants' assertion that they have a "compelling interest in limiting kosher diets to Jewish inmates," in order to avoid "the substantial additional cost of providing kosher meals to non-Jewish inmates." ER12.

That decision cannot stand. It flies in the face of over a century of precedent from the Supreme Court and this Court under both the Equal Protection Clause and the Free Exercise Clause. It also violates the clear requirements of federal law as set forth in the Religious Land Use and Institutionalized Persons Act (RLUIPA), which provides yet another basis for relief.

Because Defendants' serial violations of the law and the Constitution in this case are so egregious and so clear as a matter of law, the district court was exactly wrong to grant summary judgment in Defendants' favor. It should have granted summary judgment for the Plaintiff, which is what this Court should order now.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this proceeding under 28 U.S.C. § 1331, because this case arises under federal law. The district court issued a final order and opinion granting summary judgment for Defendants-Appellees and disposing of all claims on April 4, 2016. ER1, ER2-ER21. Plaintiff-Appellant Gene A. McLenithan, Jr., filed a notice of appeal on May 3, 2016. ER22. The appeal is thus timely pursuant to FRAP 4(a)(1)(A). This Court has jurisdiction to review the final judgment of the district court under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether Defendants violate the Free Exercise Clause by restricting Mr. McLenithan's religious exercise pursuant to a policy that facially discriminates on the basis of religion.

2. Whether Defendants violate the Equal Protection Clause by discriminating against Mr. McLenithan based on his religion.

3. Whether Defendants violate the Religious Land Use and Institutionalized Persons Act (RLUIPA) by substantially burdening Mr. McLenithan's religious exercise without any compelling justification.

4. Whether Defendants are entitled to qualified immunity for restricting Mr. McLenithan's religious exercise through their acts of flagrantly unconstitutional religious discrimination.

3

## STATEMENT OF THE CASE

### A.    Mr. McLenithan's Kosher Religious Practice

Plaintiff-Appellant Gene A. McLenithan, Jr., is a devout Seventh-day Adventist who is in the custody of the Oregon Department of Corrections (ODOC). Although Seventh-day Adventists are Christians, they take their name from a religious practice they share in common with Judaism: they observe the Sabbath on the "seventh day of the week," from sunset Friday to sunset Saturday, in accordance with the Old Testament (Gen 2:3, Exodus 20:8-10). Seventh-day Adventists also believe that they remain bound to follow the dietary laws set forth in Leviticus and other books of the Old Testament, such as abstaining from pork and other "unclean" foods. *See, e.g.*, Mark A. Kellner, *The Jews of Adventism*, ADVENTIST REVIEW, http://www.adventistreview.org/the-jews-of-adventism (detailing similarities between Jewish and Seventh-day Adventist practice, including "their mutual belief in the Sabbath and eating food the Bible permitted," "men wearing skullcaps and prayer shawls," and "recit[ing] prayers in the Hebrew language of their forebears").

As in many religions, however, individual Adventists vary somewhat in their specific dietary practices due to differences in religious interpretation. Accordingly, as explained in ODOC's own "Handbook of Religious Beliefs and Practices," "most Adventists adhere to a vegetarian diet while other[s] follow a Kosher diet

4

(this can be strict Kosher or pork free depending on the individual)." ER117. "Individual conscience is the determining factor." *Id.*

As Mr. McLenithan stated in a sworn declaration in the district court, his religious interpretation of the Old Testament requires him to maintain a kosher diet. ER94-96. In particular, he believes that "[i]f I consume foods that don't follow the health laws set forth for us to follow in the Bible, I am not living righteously and will not be received in heaven." ER94. *See also* ER112-15 (setting forth the particular scriptural passages that form the basis of Mr. McLenithan's dietary strictures). In addition, he believes that the "Levitical laws . . . dictate[] specific methods by which allowable foods are prepared for consumption," including the requirement that all "containers, pots and pans[,] utensils, and all other implements used in their preparation must not come into contact with any item that is or has had contact with non-kosher food." ER94-95 (citing chapter and verse of Leviticus and Deuteronomy). Because Mr. McLenithan follows these dietary rules and other traditional Judaic practices, he refers to himself not only as a Seventh-day Adventist, but also a "spiritual Jew." ER108.

As the district court explained, ODOC generally provides three dietary options for its inmates, including a kosher option for inmates who are adherents of traditional Judaism:

> The first option is "mainline fare," which includes meat and dairy. The second option is the "meat alternative tray," which contains no

5

> meat, and for which the dairy components of the tray are optional. The meal consists of rice, beans, fresh fruit and vegetables, and bread. The third option is the kosher diet, which consists of packaged frozen kosher entrees from vendors and supplemental kosher menu items.

ER3 (citations omitted). ODOC provides the meat-alternative tray for Seventh-day Adventist inmates, based on the advice of supposed "Seventh Day Adventist authorities" who believe that "the meat-alternative tray offered by ODOC satisfies the directive from Leviticus to maintain a healthy diet." ER16. In his sworn declaration in the district court, however, Mr. McLenithan explained that he disagreed with these authorities based on his interpretation of the relevant biblical passages. According to his interpretation, "[o]f the meals served by the Department of Corrections, whether it be the mainline meal or the beans and rice vegetarian meals[,] neither meet the requirements [of my religious belief]. The only meal that meets the requirement spoken of in the Bible is the Vegetarian Kosher meals currently served to the Jewish inmates." ER95-96.

## B.    Defendants' Discriminatory Policy

Based on his sincerely held religious beliefs, Mr. McLenithan first requested a kosher dietary accommodation from ODOC in November 2000, which was denied. ER131. He repeated that request several times over the following years, including a written request in January 2004. ER76. In February 2004, an ODOC official once again denied the request, stating that, without regard to an inmate's sincerity, "[i]t is the department's policy that only Jewish adherents are approved

6

for Kosher Diet." ER77. After further correspondence, Mr. McLenithan wrote to Defendant Steven Toth, the prison chaplain, calling his attention to the "Religious Beliefs and Practices of Seventh Day Adventist[s], as documented in the [ODOC] Handbook of Religious Beliefs and Practices," which acknowledged that some Seventh-day Adventists adhere to a "strict kosher diet." ER78. He further stated that the letter was intended to "notify [ODOC] through you, an agent thereof, of a specific belief and practice, which I follow, that is, a strict kosher diet." *Id.* He acknowledged that maintaining a strict kosher diet may "not generally [be] practice[d] within the Adventist faith," but stated that "it is nevertheless within the scope thereof and based on my individual conscience." *Id.* Chaplain Toth replied: "Currently Kosher Diets are only available to inmates of the Jewish faith. That comes from the Religious Services Administrator." *Id.*

Mr. McLenithan then wrote back to Chaplain Toth, stating, "Thank you for admitting that those Kosher Diets are available to 'the Jewish faith' only. Please provide me with a copy of the requirements for those of 'the Jewish Faith' to obtain those Kosher Diets." ER79. After a period of some weeks, during which he was apparently waiting for guidance from his superiors in the state capital, Chaplain Toth replied: "The requirements are that the person is a sincere practitioner of Jewish belief, traditions, etc. Sorry for the delay of response. I have [been] waiting to hear back from Salem what the requirements are." *Id.* When Mr.

7

McLenithan again called Chaplain Toth's attention to the ODOC Handbook of Religious Beliefs and Practices recognizing that some Seventh-day Adventists follow a "strict kosher" diet, Chaplain Toth responded: "SDA & Jewish have some similar beliefs and also not similar beliefs. I'll point out that at the beginning of SDA section of the Handbook it states—The information on the Seventh Day Adventist has been provided by a recognized community resource of this faith. This information is not endorsed by [ODOC] nor does it constitute [ODOC] policy." ER80.

Mr. McLenithan followed up with another letter to Chaplain Toth, expressing his bewilderment: "There is only one kosher diet . . . not a Jewish kosher diet and a SDA kosher diet . . . they are the same diet. Would you agree?" ER81 (ellipses in original). Chaplain Toth replied that he already "gave you my opinion," stating further, "My boss, [Administrator of Religious Services] T. O'Connor, gave me the response to your question—the Kosher diets are for Jewish inmates." *Id.* Mr. McLenithan replied: "The basis for the 'kosher' diet comes from the same books of Moses. Jewish writings and Christian writings concerning the books of Moses are essentially the same. . . . I seek to discover how a Jewish non-Christian can practice a kosher diet and a Jewish Christian cannot . . . both believing in the same laws found in the books of Moses[.]" ER82. No explanation ever came, and ODOC continued to deny Mr. McLenithan a kosher diet for the

8

next several years solely because he was a "Jewish Christian" instead of a "Jewish non-Christian."

Defendants' discriminatory treatment of Mr. McLenithan was a faithful application of ODOC's written policy. As explained in the affidavit of Dennis Holmes, ODOC's Assistant Administrator of Religious Services, "the provision of a Jewish kosher diet was determined by the ODOC Administrative Rules governing *Food Services – Kosher Diets*," which provided that "Jewish inmates in Department of Corrections facilities"—and Jewish inmates only—"may request approval to participate in the Department's Kosher diet program." ER62. As originally written in 1998, this policy stated that kosher accommodation requests would be forwarded to an "approved Jewish religious representative for verification that the inmate is Jewish by birth or by conversion in accordance with the religious doctrinal requirements of Judaism." ER64. In 1999, the Rules were slightly amended to eliminate the "birth or conversion" language, although the new Rules still required a "Jewish religious representative" to "verif[y] that the inmate is Jewish in accordance with the religious doctrinal requirements of Judaism." ER68.

### C. The *Wofford* Decision and ODOC's Promise of a Change in Policy

In August 2008, after ODOC's discriminatory policy had been on the books for 10 years, a federal district court granted a preliminary injunction in a separate

9

lawsuit brought against ODOC by another Seventh-day Adventist inmate. The court held that the plaintiff had "established a probable chance of success on the merits . . . as well as the possibility of irreparable harm if Defendants fail to provide him with a Kosher diet." *Wofford v. Williams*, No. 07-CV-192-BR, 2008 WL 3871756, at *9 (D. Or. Aug. 20, 2008). Among other things, the court concluded that the ODOC officials had failed to establish any "legitimate penological interest[]" that could justify the difference in "treatment of [Seventh-day Adventists] and their treatment of Jewish inmates." *Id.* The court also rejected ODOC's asserted interest in cost control, because ODOC had failed to provide any "competent evidence of the additional cost of providing Kosher meals to ODOC's Seventh Day Adventist inmates," and "failed to provide any evidence that all Seventh Day Adventist inmates in the ODOC system would request Kosher meals even if such meals were available to them." *Id.* at *8.

In the wake of that decision, ODOC reached a settlement with the *Wofford* plaintiff. In the settlement agreement, ODOC broadly agreed that "[n]o inmate will be rejected for a kosher diet solely because he is not Jewish," and that ODOC "will consider requests for kosher diets from non-Jewish inmates[] if [they] have a sincerely held religious belief that they require a kosher diet[] and that belief can be sustained by an organized religion." ER62; ER73.

10

In September 2008, within weeks of the *Wofford* decision, Chaplain Toth finally granted Mr. McLenithan an interview regarding his still-pending request for a kosher dietary accommodation. On the basis of that interview and an accompanying questionnaire, Chaplain Toth gave Mr. McLenithan the highest possible rating for the sincerity of his religious beliefs—a perfect "10 out of 10" score. ER138, ER162; *see also* Consent Motion to Supplement the Record, Dkt. # 14 (Sept. 8, 2016). Chaplain Toth and Mr. McLenithan then signed a "Kosher Diet Participation Agreement," ER139, and ODOC began providing kosher meals to Mr. McLenithan for roughly the next week—but then had second thoughts. After the week had expired, Chaplain Toth ordered Mr. McLenithan's kosher meals to stop, apparently on the ground that he "had not yet received final approval for a kosher diet." ER99. Mr. McLenithan was thus removed from the kosher program once again.

In November 2008, Mr. McLenithan received a letter from Thomas O'Connor, ODOC's Administrator of Religious Services, expressing "regret that we have not been able to meet with you about your religious accommodation request." ER102. The letter explained that ODOC officials were revising their accommodation procedures and "had hoped to [meet with you] before the end of October," but, "[u]nfortunately, we have not been able to keep to this schedule." *Id.* "We apologize for the delay and appreciate your patience." *Id.*

11

### D. This Litigation and ODOC's Broken Promise

Mr. McLenithan's patience finally ran out in January 2009, when he filed this lawsuit. In his *pro se* complaint, he explained that the Defendants "are all aware of my sincere religious belief that I should eat only a kosher diet," but that they nonetheless are "deliberately forcing me to defile myself" by denying a dietary accommodation. ER174-75. He accordingly asserted claims for injunctive and monetary relief under the Religious Land Use and Institutionalized Persons Act (RLUIPA), as well as the First Amendment, the Eighth Amendment, and the Equal Protection Clause of the United States Constitution, pursuant to 42 U.S.C. § 1983.

On April 20, 2009, Mr. McLenithan filed a motion for preliminary injunction to enforce his rights under RLUIPA and the Constitution. ER153. This prompted a visit the very next day from Chaplain Toth, who administered a new questionnaire to Mr. McLenithan. ER99. Based on Chaplain Toth's recommendation, ODOC Assistant Administrator of Religious Services Dennis Holmes then "approved Mr. McLenithan's request" for a kosher diet on April 23. *Id*. He noted, however, that the approval was only temporary: it would continue only "during the pendency of this litigation." ER100.

In May 2009, still acting *pro se*, Mr. McLenithan filed the operative amended complaint, which contained no major changes. ER103-46. He then filed a

motion for summary judgment on all of his claims that July. Over the next several months, Mr. McLenithan submitted several additional exhibits and declarations in support of his motion. Defendants also conducted a deposition during which Mr. McLenithan explained his religious beliefs at length in response to questioning from the State's attorney.

In January 2010, Defendants filed a cross-motion for summary judgment. Citing *Wofford*, Defendants acknowledged that the district court had "previously granted a motion, under RLUIPA and the First Amendment, for a preliminary injunction to a Seventh-day Adventist seeking a kosher diet." ER43. Defendants argued, however, that the *Wofford* decision was based on "evidentiary deficiencies . . . that are rectified in this motion." *Id.*

In their summary-judgment briefing, Defendants reneged on their promise in the *Wofford* settlement to accommodate sincere religious kosher requests from non-Jewish inmates. Instead, they reasserted a "compelling interest in limiting kosher diets to Jewish inmates." ER44. Notably, Defendants admitted that they allow Jewish inmates to "receive kosher food upon request." ER53. But they claimed that they must categorically deny kosher food to *non*-Jewish inmates in order to avoid "spending hundreds of thousands of dollars to provide kosher meals to any inmate who claims that his or her religion prefers it." ER44. As supposed "evidence" for that claim, Defendants pointed to a "survey" that they designed and

13

administered to a hand-picked group of prison inmates at the "request[]" of their trial counsel. ER50. Because the survey was tailor-made for this litigation, it purported to show that many non-Jewish inmates would request kosher diets if they were allowed to do so. *Id*. The survey did not make any attempt to screen for the sincerity of inmates' religious requests. And while Defendants invoked the survey as the basis for denying kosher diets to non-Jewish inmates as far back as the year 2000, the survey itself was not designed and administered until "12/21/2009," ER71—a full five months after Mr. McLenithan filed his motion for summary judgment, and one month before Defendants filed their own cross-motion for summary judgment.

Armed with the survey results as a *post hoc* justification for their discriminatory policy, Defendants explained their refusal to accommodate Mr. McLenithan's religious practices on the ground that he "was not born Jewish and has never converted to Judaism," "he believes that Jesus Christ is his savior," and he "is not willing to renounce that belief." ER39. Instead of making any serious effort to dispute whether Mr. McLenithan's religious beliefs were *sincere*, Defendants faulted Mr. McLenithan for not being sincerely *Jewish*, and for "believ[ing] that some Levitical laws remain in effect, but not others, based on his personal interpretation of the Bible." ER41; ER39. Indeed, in the course of disparaging Mr. McLenithan's religious beliefs, Defendants affirmatively

14

conceded that he genuinely "*believes* that the [biblical] dietary laws remain in effect," but criticized him for supposedly being inconsistent because he "does not believe [in] the limitations on the number of textiles one must wear, or that one who curses their parents should be put to death." ER41 (emphasis added). Consequently, because Defendants did not consider him sufficiently Jewish, they asserted that it would be too expensive to accommodate him and others like him.

Although the parties completed summary-judgment briefing in March 2010, the case inexplicably sat on the district court's docket for the next six years. During that time, Defendants continued to provide a kosher diet to Mr. McLenithan, as they had been doing since he filed his motion for preliminary injunction in April 2009. And yet, despite Defendants' claim that providing him with a kosher diet would undermine a "compelling" state interest, they waited until March 2016 to even file a motion for status conference. In that motion they finally asked the court for a decision, arguing that "the central question in this case implicates significant policy and operational issues for ODOC, and the outcome of this litigation will have an impact on inmates beyond plaintiff." ER24. Pursuant to 28 U.S.C. § 636(c)(1), the parties consented to have the case resolved by a magistrate judge.

### E.    The Decision Below

On April 4, 2016, the magistrate judge issued a final order and opinion for the district court denying Mr. McLenithan's motion for summary judgment and

granting summary judgment for Defendants on all claims. The court began by acknowledging that "Plaintiff has established his belief that he must eat a Kosher diet is sincerely held and is rooted in his religious beliefs as a Seventh Day Adventist." ER10. The court's conclusion took into account evidence that Mr. McLenithan had purchased some non-kosher items from the prison commissary, which the court found insignificant given the common practice of inmates sharing and trading commissary items with their fellow prisoners. ER11. The court was also unmoved by Defendants' observation that, among his many assertions of kosher religious observance, Mr. McLenithan also complained (unsurprisingly) about the quality of the "meat-alternative" fare. ER11. The court thus recognized, as Defendants themselves had essentially conceded, that Mr. McLenithan "sincerely" seeks to exercise his religion by maintaining a kosher diet. ER10. The court also had no trouble concluding that Defendants imposed a "substantial burden" on that religious exercise by placing "a significantly great restriction or onus upon such exercise," thereby triggering strict scrutiny under RLUIPA. *Id.* (quoting *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).

Next, applying strict scrutiny, the court rejected Mr. McLenithan's RLUIPA claim on the ground that Defendants "establish[ed] a compelling interest in limiting kosher diets to Jewish inmates," which the court held was the "least

restrictive means" of avoiding the "substantial additional cost" of "providing kosher meals to non-Jewish inmates." ER12. "To be sure," the court noted, "the cost of accommodating Plaintiff alone is not significant." *Id.* But nonetheless, the court held, "if Plaintiff were to be accommodated by providing the kosher meal option, other inmates will likely have to be accommodated as well, ultimately at great expense to ODOC." *Id.* For that reason, the court ruled that Defendants were entitled to judgment on Mr. McLenithan's RLUIPA claim as a matter of law.

On the First Amendment Free Exercise claim, the court applied the "four-factor test" from *Turner v. Safley*, 482 U.S. 78, 90-91 (1987), which applies to neutral and generally applicable prison policies that burden the exercise of religion. Based on the four *Turner* factors, the court concluded that Mr. McLenithan failed to "raise a triable issue of fact that his right to free exercise of religion was improperly impinged upon by Defendants." ER13-17. The court applied the same four-factor test to reject Mr. McLenithan's claim under the Equal Protection Clause. ER18-19. The court also rejected Mr. McLenithan's "deliberate indifference" claim under the Eighth Amendment. ER19-20.

One week after the district court's decision, ODOC stopped providing a kosher diet to Mr. McLenithan. In the following weeks, Mr. McLenithan retained pro bono appellate counsel and filed a notice of appeal on May 3. ER22. Through counsel, he then wrote to Defendants requesting reinstatement in the kosher

17

program based on a prior sworn affidavit executed by Defendants' counsel stating that "Defendants will continue to provide a kosher diet to plaintiff during the pendency of this lawsuit." That same day, Defendants agreed to reinstate his kosher diet while this appeal remains pending. Through their conduct, Defendants have thus made clear that they intend to revoke Mr. McLenithan's kosher dietary accommodation unless they are ordered otherwise as a result of this litigation.[1]

---

[1] At the time this lawsuit was filed, Mr. McLenithan was incarcerated at the Snake River Correctional Institution (SRCI) in Ontario, Oregon. In 2009, he was transferred to the Oregon State Penitentiary (OSP), where he remains today. Because he remains in the custody of the Oregon Department of Corrections (ODOC), this transfer is immaterial to the substance of his claims. For purposes of prospective injunctive relief, however, some of the official-capacity Defendants should be substituted due to the transfer as well as other changes in ODOC personnel. In particular, ODOC Director Max Williams has been replaced by Colette S. Peters. ODOC Administrator of Religious Services Timothy O'Connor has been replaced by his former deputy, Dennis Holmes. ODOC Inspector General Rebecca Prinslow has been replaced by Craig Prins. SRCI Superintendent Mark Nooth should be replaced with OSP Superintendent Jeff Premo.

## SUMMARY OF THE ARGUMENT

**I.** Defendants' discriminatory restriction of Mr. McLenithan's sincere kosher dietary practice violates both the United States Constitution and federal law. Strict scrutiny applies under both the Free Exercise Clause and the Equal Protection Clause because Defendants' restriction of Mr. McLenithan's religious exercise was facially discriminatory on the basis of religion: Defendants admit that if Mr. McLenithan's kosher observance were motivated by traditional Judaism instead of Seventh-day Adventism, then he would be entitled to a dietary accommodation. At the same time, strict scrutiny also applies under RLUIPA because forcing Mr. McLenithan to eat a non-kosher diet imposes a "substantial burden" on his religious exercise. As a result, Defendants' denial of a kosher dietary accommodation for Mr. McLenithan cannot be justified unless it is the least restrictive means of advancing a compelling government interest.

Defendants cannot survive strict scrutiny for several reasons. Most straightforwardly, as a matter of law, religious discrimination is not a permissible means of controlling the cost of religious dietary accommodations. The Constitution and RLUIPA require states to control costs not by favoring one religious denomination over another, but instead by drawing lines between *sincere* and *insincere* religious claimants. That is a sufficient basis to reverse the decision below, and this Court need go no further.

19

Defendants also fail strict scrutiny for several additional reasons. Even according to their own grossly exaggerated cost projections, their discriminatory policy saves them only one or two percent of their total food budget, which falls well short of the type of "compelling" interest necessary to satisfy strict scrutiny. To make matters worse, moreover, Defendants have failed to offer any competent evidence to substantiate their projected cost savings. Nor have they attempted to explain how other states can effectively operate a system of religious dietary accommodations without engaging in religious discrimination.

In any event, even if religious discrimination were a permissible means of cost savings, and even if excluding non-Jewish inmates from the kosher program truly did advance a compelling interest in cost control, Defendants could readily serve the same interest through less-restrictive means. Most obviously, they could do what other states do, which is to adopt a non-discriminatory procedure for screening the *sincerity* of religious requests for kosher meals, instead of categorically favoring one religious denomination over another. In the unlikely event that the State of Oregon cannot afford to accommodate the small number of inmates who sincerely observe kosher dietary rules, then Defendants can still avoid religious discrimination by rationing their limited resources among qualified inmates in an even-handed manner. What they emphatically may *not* do is facially

discriminate on the basis of religion, based on the stereotype that only traditionally Jewish inmates should receive kosher meals.

**II.** Defendants are not entitled to qualified immunity because their discriminatory conduct in this case flagrantly violates decades of clearly established law. In particular, it has been settled law for over a century that the First and Fourteenth Amendments prohibit the states from arbitrarily favoring one religious denomination over another. It has also been settled law for over three decades that discriminatory burdens on religious exercise are subject to strict scrutiny, which Defendants plainly cannot satisfy here. And in particular, as this Court held just last year, it has been clearly established in this Circuit since 1997 that the Constitution requires prisons to offer kosher dietary accommodations to sincere religious claimants.

**III.** Because Defendants' undisputed discriminatory conduct in this case clearly violates the Constitution and RLUIPA as a matter of law, this Court should not only reverse the district court's decision, but should order summary judgment for Mr. McLenithan, and should remand to the district court for the calculation of damages. This case has already been pending for 7 years, and there is no genuine issue of material fact that remains to be resolved on the merits.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's decision to grant or deny summary judgment. *See Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768, 778 (9th Cir. 2006). Likewise, the Court reviews *de novo* the district court's conclusions on matters of law, especially matters of constitutional law. *See Perez-Gonzalez v. Ashcroft*, 379 F.3d 783, 786 (9th Cir. 2004). In determining whether there is any genuine dispute of material fact, all reasonable inferences must be drawn in favor of the non-moving party. *See, e.g., Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove*, 419 F.3d 925, 927 (9th Cir. 2005).

## ARGUMENT

This is a simple case because Defendants have made no secret of their discriminatory policy, which they defended in the court below with admirable candor: While they provide kosher dietary accommodations to adherents of traditional Judaism "upon request," they categorically refuse to provide the precise same accommodation to any "non-Jewish" inmates who request the exact same kosher accommodation based on their sincere religious beliefs. This discriminatory policy clearly violates the constitutional and statutory rights of Mr. McLenithan, a Seventh-day Adventist who seeks to maintain a kosher diet based on his sincere religious interpretation of the Old Testament.

Because the constitutional prohibition against this type of discrimination has been so clearly established for so long, Mr. McLenithan is entitled not only to injunctive relief but to significant damages for the many years during which Defendants unlawfully forced him to choose between either starving himself or defiling himself in violation of his religious beliefs. And because Mr. McLenithan is entitled to judgment as a matter of law based on the undisputed facts of this case, this Court should not only reverse the district court's grant of summary judgment in favor of Defendants, but should order the court to grant Mr. McLenithan's motion for summary judgment.

## I.    Defendants' Discriminatory Conduct Violates The Constitution and RLUIPA

Under well-established principles of law set forth in binding precedent of the Supreme Court and this Court, Defendants' discriminatory restriction of Mr. McLenithan's kosher religious observance is unlawful three times over: It triggers and fails strict scrutiny under each of the Free Exercise Clause, the Equal Protection Clause, and RLUIPA.  For Defendants to prevail, they must show that forcing Mr. McLenithan to eat a non-kosher diet is the "least restrictive means" of serving a "compelling" interest in cost control, the only interest they have ever asserted. For a number of reasons, they cannot survive that exacting scrutiny. The Constitution requires them to control the costs of religious dietary accommodations not by categorically favoring one religious denomination over another, but instead by drawing lines between *sincere* and *insincere* religious claimants.

### A.    Strict Scrutiny Applies to Defendants' Discriminatory Exclusion of Mr. McLenithan From the Kosher Meal Program

Defendants' discriminatory denial of Mr. McLenithan's request for a kosher dietary accommodation is subject to strict scrutiny under three separate provisions of the Constitution and federal statutory law. Most glaringly, because Defendants' policy facially discriminates on the basis of religion, it triggers strict scrutiny under both the Free Exercise Clause of the First Amendment as well as the Equal Protection Clause of the Fourteenth Amendment. Additionally, even if Defendants

had not acted in a discriminatory manner, they still would be subject to strict scrutiny under RLUIPA because forcing Mr. McLenithan to eat a non-kosher diet imposes a "substantial burden" on his exercise of religion.

### 1. Strict Scrutiny Applies Under the Free Exercise and Equal Protection Clauses

"The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof.*'" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). The protected category of the "exercise" of religion covers any "religiously motivated conduct," including the "performance of (or abstention from) physical acts . . . for religious reasons." *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990); *see also Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (describing religious exercise as any "conduct prompted by religious principles").

To determine whether a practice qualifies as a protected exercise of religion, the sole question is whether the practice is "grounded in a sincerely held religious belief." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). As long as the plaintiff's religious belief is sincerely held, it "is not within the judicial ken to question . . . the validity of [his] interpretation[] of [his] creed[]." *Hernandez v. Commissioner*,

490 U.S. 680, 699 (1989). Moreover, "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect," as "it is not within the judicial function and judicial competence to inquire [who has] more correctly perceived the commands of their common faith." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981). Individual religious adherents have a constitutional right to disagree with religious "authorities" of the same denomination, because the First Amendment bars adjudication of "the truth or verity of [a person's] religious doctrines or beliefs." *United States v. Ballard*, 322 U.S. 78, 86 (1944).

The Second Circuit has applied these principles in the context of a non-Jewish inmate requesting a kosher diet, and has squarely held that "the question whether [an inmate's] beliefs are entitled to Free Exercise protection turns on whether they are sincerely held, not on the ecclesiastical question whether he is in fact a Jew under Judaic law." *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999). Under binding Supreme Court precedent, that proposition cannot reasonably be disputed. Accordingly, as Defendants here conceded in the court below, the "case law" on religious exercise "relies solely on evaluating an inmate's sincerity." ER48.

When a state burdens an exercise of religion, the level of judicial scrutiny demanded by the Free Exercise Clause depends on the nature of the state policy at issue. If the policy is "neutral [and] generally applicable," it is subject to little or no

constitutional scrutiny. *Smith*, 494 U.S. at 880. But if the policy is *discriminatory*, and "is not neutral or not of general application," then it "must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 533, 546. Thus, for example, if a state policy "restrict[s] practices because of [the plaintiff's] religious motivation, [the policy] is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533 (citation omitted).

Applying strict scrutiny to policies that fail the "neutrality" test ensures that minority religious adherents, and particularly those with less well-known religious beliefs, are not subject to "discriminatory treatment" compared to adherents of more traditional faiths. *Id.* at 538. "[T]he minimum requirement of neutrality is that a [policy] not discriminate on its face," and that the state not "treat[] some religious denominations more favorably than others." *Id.* at 533 (citing *Larson v. Valente*, 456 U.S. 228 (1982)). The Free Exercise Clause also "extends beyond facial discrimination" and "forbids subtle departures from neutrality," thereby "protect[ing] against governmental hostility which is masked, as well as overt." *Id.* at 534.

As this Court has recognized, "[t]he right to exercise religious practices and beliefs does not terminate at the prison door." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone v. Shabazz*, 482 U.S. 342 (1987)). To the contrary, because "[i]nmates must rely on the prison system to provide them with

the necessities of life," including their basic diet, "prison officials" have a heightened constitutional "obligation" to "accommodate a prisoner's right to free exercise." *Ward v. Walsh*, 1 F.3d 873, 876-77 (9th Cir. 1993). For that reason, this Court has held that the relaxed standard of constitutional scrutiny announced in *Smith* for neutral and generally applicable laws does not apply to "free exercise claims of prisoners." *Id.* at 876. *See also Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997) (striking down neutral prison policy denying kosher diet). Accordingly, as even *neutral and generally applicable* prison policies are subject to higher-than-normal scrutiny, *discriminatory* prison policies are subject to at least the same strict scrutiny that normally applies under *Lukumi*.

The ban against religious discrimination under the Free Exercise Clause is reinforced by the Equal Protection Clause. *See Lukumi*, 508 U.S. at 540 ("In [applying] the Free Exercise Clause, we can also find guidance in our equal protection cases."). In general, any "classification" based on "religion" is among the few "inherently suspect distinctions" that triggers strict scrutiny to guard against "invidious discrimination." *City of New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976); *see also Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312-13 (1976) ("[E]qual protection analysis requires strict scrutiny . . . when [a] classification . . . operates to the peculiar disadvantage of a suspect class."). In the prison context, specifically, "[t]he Constitution's equal protection guarantee

28

ensures that prison officials cannot discriminate against particular religions." *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citing *Cruz v. Beto*, 405 U.S. 319, 321-22 (1972) (per curiam)). Thus, when it comes to minority religious adherents, the Equal Protection Clause "entitles" them to the same treatment "afforded fellow prisoners who adhere to conventional religious precepts.'" *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008). In particular, to the extent prisoners seeking a religious accommodation are "similarly situated," the Constitution "requires the State to treat [them] equally." *Id.*

Here, strict scrutiny applies because Defendants have applied a facially discriminatory policy that severely burdens Mr. McLenithan's religious exercise by refusing to accommodate his religious practice of adhering to a kosher diet, for the sole reason that he adheres to the wrong religion. As the district court found, based on the extensive evidence in the record, Mr. McLenithan "has established his belief that he must eat a Kosher diet is sincerely held and is rooted in his religious beliefs as a Seventh Day Adventist." ER10. Indeed, Defendants themselves found Mr. McLenithan's individual religious beliefs highly credible based on a questionnaire and personal interview conducted by Chaplain Toth, who gave him a "10" out of 10 rating for sincerity. *See supra* p. 11. Defendants' own "Handbook of Religious Practices" recognizes that some "Adventists follow a Kosher diet (this can be strict Kosher or pork free depending on the individual)," and that

29

"[i]ndividual conscience is the determining factor." ER156. And Defendants *conceded* in the court below that Mr. McLenithan wants to keep kosher because he "*believes* that some Levitical laws remain in effect, but not others, based on his personal interpretation of the Bible." ER41 (emphasis added). As a result, there is no genuine dispute that Mr. McLenithan's practice of maintaining a kosher diet is based on his sincerely held religious beliefs, and is thus an "exercise of religion" within the meaning of the First Amendment.

Nonetheless, despite Mr. McLenithan's clear religious practice of keeping kosher, Defendants have refused him a kosher diet for the sole reason that he is not traditionally Jewish. Indeed, Defendants candidly admitted in the court below that their policy "limit[s] kosher diets to Jewish inmates," ER44, and that traditionally Jewish inmates alone are entitled to "receive kosher food upon request." ER53. Indeed, between January 1998 and June 2009 it was ODOC's express written policy that "Jewish inmates in Department of Corrections facilities"—and Jewish inmates only—"may request approval to participate in the Department's Kosher diet program." ER62. If there were any doubt about the facially discriminatory nature of the policy, it expressly required a "Jewish religious representative" to "verif[y] that the inmate is Jewish in accordance with the religious doctrinal requirements of Judaism." ER68.

30

In accordance with that discriminatory policy, Defendants have repeatedly informed Mr. McLenithan that he could not receive a kosher diet because he adheres to the wrong religion: "It is the department's policy that only Jewish adherents are approved for Kosher diet," ER77; "Kosher Diets can be given to Jewish adherents," but "Jewish-Christian groups don't qualify," ER83; "Kosher Diets are only available for inmates of the Jewish faith," ER78; "The requirements are that the person is a sincere practitioner of Jewish beliefs, traditions, etc.," ER79; "the Kosher Diets are [only] for Jewish inmates," ER81.

Despite Defendants' promise to change their discriminatory policy after the 2008 *Wofford* decision, their discriminatory treatment continues to this day: In their briefing below, Defendants candidly asserted a compelling need to "limit[] kosher diets to Jewish inmates." ER44. They also defended their refusal to accommodate Mr. McLenithan because he "was not born Jewish and has never converted to Judaism," "he believes that Jesus Christ is his savior," and he "is not willing to renounce that belief." ER39. And, remarkably, the district court *agreed* that Defendants' policy serves "a compelling interest in limiting kosher diets to Jewish inmates." ER12.

In light of these undisputed facts, it is clear that Defendants have burdened Mr. McLenithan's exercise of religion through a facially discriminatory policy—a policy that they vow to continue applying if they prevail in this case. In all material

31

respects, Mr. McLenithan is not only "similarly situated" but *identically situated* to his fellow inmates who are traditionally Jewish, *Shakur*, 514 F.3d at 891. Just like traditional Jewish inmates, Mr. McLenithan sincerely believes that his religion requires him to keep a "strict kosher" diet. ER156. The only difference is that he is motivated by a different religious faith—namely, Seventh-day Adventism. Defendants admit that if he were instead traditionally Jewish, he would receive a kosher accommodation "upon request." ER53. It is thus entirely clear that Defendants' policy "restrict[s]" Mr. McLenithan's religious practice solely "*because of* [his] religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis added). Accordingly, Defendants' policy "is not neutral" among religious groups, and is thus "invalid" under the Constitution "unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.*

### 2. Strict Scrutiny Applies Under RLUIPA

RLUIPA provides that states may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the state "demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc–1(a). Like the Free Exercise Clause, "RLUIPA protects 'any exercise of religion, whether or not compelled by,

or central to, a system of religious belief,'" as long as the "request for an accommodation [is] sincerely based on a religious belief." *Holt*, 135 S. Ct. at 862 (quoting 42 U.S.C. § § 2000cc–5(7)(A)).

Under RLUIPA, there is a "'substantial burden' on 'religious exercise'" when a state "impose[s] a significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (citation omitted). In addition, both "Supreme Court and Ninth Circuit precedent . . . clearly hold" that a prison "imposes a substantial burden" when it "puts significant pressure on inmates . . . to abandon their religious beliefs" and to act contrary to their faith. *Id.* at 996. This includes situations where the prison "put[s] substantial pressure on" an inmate by "den[ying]" him "an important benefit" unless he "violate[s] his beliefs." *Id.* at 995 (quoting *Thomas*, 450 U.S. at 717-18 (1981)).

This Court and many others have squarely held that forcing a prisoner to eat a diet contrary to his religious beliefs imposes a substantial burden on religious exercise. Thus, it is "well established" that a prison "places a substantial burden on an individual's right to free exercise of religion" when it "[r]equir[es] a believer to defile himself" by denying him a "kosher diet." *Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015) (citing *Ashelman*, 111 F.3d at 677). As the Tenth Circuit has succinctly explained, the "failure to provide a [kosher] diet . . . places substantial pressure on [a prisoner] not to engage in his religious exercise by presenting him

33

with a Hobson's choice—either he eats a non-[kosher] diet in violation of his sincerely held beliefs, or he does not eat." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010); *see also, e.g.*, *Baranowski v. Hart*, 486 F.3d 112, 124-25 (5th Cir. 2007) (stating that "[t]here is no question" that keeping kosher is a religious exercise, and that a prison's "policy of not providing kosher food may be deemed to work a substantial burden upon [an inmate's] practice of his faith").

As the district court recognized, these principles are dispositive on the substantial-burden issue. ER9-11. Mr. McLenithan sincerely believes that he must maintain a kosher diet, and Defendants' policy imposes substantial pressure on him to violate that belief by forcing him to either eat a non-kosher diet or starve. Thus, as this Court recently put it, Defendants' policy effectively "requires him to defile himself by doing something that is completely forbidden by his religion." *Jones*, 791 F.3d at 1033 (citing *Ashelman*, 111 F.3d at 677). That is a textbook example of a "substantial burden" on religious exercise. *Id.* Consequently, even if Defendants had treated Mr. McLenithan equally without discriminating against his religious faith, their denial of his request for a kosher dietary accommodation would still be subject to strict scrutiny under RLUIPA.

## B. Defendants' Discriminatory Policy Cannot Survive Strict Scrutiny

As demonstrated above, strict scrutiny applies here under both the Constitution and RLUIPA because Defendants have imposed a substantial burden

34

on Mr. McLenithan's religious exercise and discriminated against him on the basis of his religious beliefs. Accordingly, Defendants "bear the burden of persuasion to prove" that denying a kosher diet for Mr. McLenithan "is both 'in furtherance of a compelling governmental interest' and the 'least restrictive means of furthering that compelling governmental interest.'" *Warsoldier*, 418 F.3d at 995 (quoting 42 U.S.C. §§ 2000cc–1(a), 2000cc–2(b)); *Lukumi*, 508 U.S. at 533. These are two independent requirements that together impose "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). This stringent test does not allow the state to rely on unsubstantiated "slippery-slope concerns," but instead requires proof of a compelling need to deny a "specific" accommodation "to [the] particular religious claimant[]" at issue. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431, 435 (2006). Although "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules," that "does not justify the abdication of the responsibility . . . to apply [the] rigorous standard" of strict scrutiny in judicial proceedings. *Holt*, 135 S. Ct. at 864.

In the court below, Defendants' sole strict-scrutiny argument was that they "have a compelling interest in limiting kosher diets to Jewish inmates," and that doing so is the "least restrictive means" to avoid "spending hundreds of thousands of dollars to provide kosher meals to any inmate who claims that his or her religion

prefers it." ER44. The district court agreed, granting summary judgment for Defendants based on their supposed "compelling interest in limiting kosher diets to Jewish inmates." ER12. The court acknowledged that "the cost of accommodating [Mr. McLenithan] alone is not significant." *Id*. But the court then held that "if non-Jewish inmates were allowed the option of choosing the kosher meal plan, a substantial percentage would likely do so," and that Defendants thus had a compelling need to avoid "the substantial additional cost of providing kosher meals to non-Jewish inmates." *Id*.

This reasoning is woefully deficient. Even accepting the dubious notion that providing kosher dietary accommodations would be so costly as to imperil a truly "compelling" state interest, there is no possible justification for Defendants to serve that interest by facially discriminating on the basis of religion. Favoring traditionally Jewish inmates over other religious adherents with their own sincere kosher-diet requirement is the very definition of arbitrary religious discrimination, which is not a permissible means of controlling costs. If Defendants truly cannot afford to provide a kosher diet to every inmate whose religion requires it, then they must devise a neutral policy to ration their limited resources without favoring particular religious groups over others. Because Defendants have instead adopted and applied a policy that facially discriminates on the basis of religion, they fail strict scrutiny as a matter of law.

36

### 1. Religious Discrimination Is Not A Permissible Means of Controlling the Cost of Dietary Accommodations

The Supreme Court has made clear that discriminatory state action "that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Indeed, neither this Court nor the Supreme Court has ever upheld a law that "treat[s] some religious denominations more favorably than others." *Id.* at 533 (citing *Larson v. Valente*, 456 U.S. 228 (1982)). And whatever "rare" circumstances might someday be found to justify such discrimination, they clearly do not exist here.

Religious discrimination is not a permissible means of controlling the cost of dietary accommodations, because any preference for one sincere religious adherent over another is necessarily arbitrary. Here, for example, Mr. McLenithan and traditional Jewish inmates both sincerely believe that their religion requires them to adhere to precisely the same kosher diet offered by ODOC, and there is no permissible reason to favor either of them based solely on their religious faith. To the contrary, it has been well settled for over a century that such "pure favoritism" of one "religious" faith over another is entirely "arbitrary, oppressive, [and] capricious," and is thus an unconstitutional "denial of the equal protection of the laws." *Am. Sugar-Ref. Co. v. State of Louisiana*, 179 U.S. 89, 92 (1900). Such flagrant disparate treatment is flatly contrary to the well-established rule that "prison officials cannot discriminate against particular religions." *Freeman*, 125

37

F.3d at 737. Indeed, it has been clearly established law for at least 40 years that it "violate[s] the First and Fourteenth Amendments" for a state prison system to deny an inmate "privileges enjoyed by other prisoners," "solely because of his religious . . . beliefs." *Cruz v. Beto*, 405 U.S. 319, 322 (1972). For that reason, Defendants' facially discriminatory policy must fail strict scrutiny as a matter of law.

Notably, this is not a case of a prisoner bringing a *unique* claim for a religious dietary accommodation. In that type of case, the prison may well be able to justify differential treatment, because the unique religious claimant is not "similarly situated" to others. *Shakur*, 514 F.3d at 891. That point was well illustrated in *Cotton v. Cate*, 2012 WL 1094237, at *8 (N.D. Cal. Mar. 29, 2012), where an inmate sought a customized Kemetic/vegan-organic diet, which would have required the purchase of specialty items from unknown vendors or unlicensed food vendors that would not deliver to prisons. Here, by contrast, Mr. McLenithan and his fellow inmates who are Jewish follow the same religious practice of keeping kosher, and he is requesting the *exact same accommodation* they receive under the existing kosher program. He is thus identically "situated" to them in every respect except for his religious faith, and the law "requires the State to treat [him] equally." *Shakur*, 514 F.3d at 891. Indeed, because Defendants' favoritism of one religious denomination over another is entirely arbitrary, it does not serve

38

any "legitimate penological interest[]," and would thus fail any level of constitutional scrutiny. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

### 2. Defendants Cannot Prove That Their Discriminatory Policy Serves A "Compelling" Interest In Cost Control

In light of the inherent illegality of Defendants' arbitrary religious discrimination, there is no need for this Court to go any further before concluding that Defendants' discriminatory policy clearly fails strict scrutiny and violates both the Constitution and RLUIPA. But even putting that aside, Defendants also cannot prove that excluding Mr. McLenithan from the kosher-meal program serves any true "compelling" interest. ER99. The sole interest Defendants asserted below was their interest in controlling costs, which the district court accepted with little analysis. The court first acknowledged that "the cost of accommodating [Mr. McLenithan] alone is not significant." ER12. But the court then stated, without citation, that "if [he] were to be accommodated, . . . other inmates will likely have to be accommodated as well, ultimately at great expense." *Id*. On that basis alone, the court concluded that Defendants "establish[ed] a compelling interest in limiting kosher diets to Jewish inmates." *Id.* The Supreme Court has "rejected" exactly this type of "slippery-slope argument" many times. *Holt*, 135 S. Ct. at 866; *O Centro*, 546 U.S. at 435-36 (citing *Sherbert*, 374 U.S. at 407). This Court should reject it here too.

First, Defendants assert that their discriminatory policy of excluding non-Jewish inmates from the kosher program saves them a total of "hundreds of thousands of dollars," but even if true, that is only a tiny fraction of their budget of $25.6 million for "food and kitchen supplies." ER36, ER44. The Supreme Court has repeatedly rejected such relatively minor cost savings, standing alone, as a sufficiently "compelling" interest to justify an intrusion on constitutional rights. *See, e.g.*, *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 263 (1974) ("The conservation of the taxpayers' purse is simply not a sufficient state interest"); *Graham v. Richardson*, 403 U.S. 365 (1971) ("a concern for fiscal integrity" is not a "compelling" interest); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) ("The saving of welfare costs" is not a compelling interest). Consequently, at least in circumstances like these, where Defendants have already established a kosher-meal program and could easily accommodate the plaintiff with only a marginal increase in cost, they cannot establish any true compelling need to exclude him.

Second, and relatedly, RLUIPA expressly recognizes that state governments may be required "to incur expenses in [their] own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c). As the Eleventh Circuit has pointed out, moreover, RLUIPA is Spending Clause legislation, which applies only where a state has voluntarily accepted federal correctional funding. *See Benning v. Georgia*, 391 F.3d 1299, 1312 (11th Cir.

40

2004). For that reason, states can hardly "complain about the costs of RLUIPA, because [they] consented to the costs when [they] accepted federal funds." *Id.* Here, there is no dispute that Oregon has voluntarily accepted federal prison funds, and indeed DOC's budget for 2015-2017 reflects a "Total Federal Funds" amount of $5.8 million. [2] Thus, having accepted *millions* of dollars in federal funding, Defendants cannot now claim a "compelling" need to save a few *hundred thousand* dollars by engaging in blatant religious discrimination within the bounds of their existing dietary programs.

Third, even if saving one or two percent of their food budget could theoretically qualify as a compelling interest, Defendants have failed to prove even that meager cost savings. They admit that accommodating Mr. McLenithan himself would cost only $5.64 per day, or $2,000 per year. ER36. Their claim of "hundreds of thousands" of dollars in cost savings thus depends entirely on their slippery-slope argument that a significant number of new inmates would "demand kosher meals if [Mr. McLenithan's] request were granted," but they have failed to provide any "competent evidence" for that claim. *Shakur*, 514 F.3d at 887, 890-91. Indeed, in the court below, Defendants candidly admitted that they "cannot definitively predict the total number of inmates in ODOC who would request a kosher diet" if the State stopped discriminating against non-Jewish inmates. ER56. Instead, they

---

[2] *See* Oregon Dept. of Corrections, 2015-17 Legislatively Adopted Budget, at 4, https://www.oregon.gov/doc/ADMIN/docs/pdf/revenues_lab_15-17.pdf.

41

offered an "estimate" based on a "survey" that they admittedly conducted at the "request[]" of their counsel for the purpose of this litigation, ER50, and which appears intentionally designed to inflate the projected cost.

At the outset, the survey that Defendants conducted in 2009 cannot possibly justify their discriminatory denial of kosher meals dating back to the year 2000. Strict scrutiny does not allow states to rely on this type of "post hoc" rationalization that is "invented . . . in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Between 2000 and 2009, Defendants had no justification for their discriminatory policy because they had not even *attempted* to assess the cost of accommodating sincere kosher requests from non-Jewish inmates. And it is highly implausible for them to claim now that they happened to be justified all along, based on their late-breaking, made-for-litigation survey in 2009.

The survey's design confirms that it was engineered to achieve the desired result: In administering the survey, Defendants admittedly chose not to use a "random sampling technique," and instead employed a technique of their own creation. ER52. First, to determine the percentage of each religious group that would request a kosher diet, Defendants concede that they "purposefully ch[o]se a sample of people who were *active* in any of the religious groups who might have a possible interest in a religiously-based kosher food option." ER52-53 (emphasis added). This group of 289 inmates was "selected by [prison] chaplains because of

42

their involvement in religious activities and their work with the chaplains." ER52, 54. Notably, moreover, the survey did not make any attempt to ascertain whether these inmates *sincerely believed* they needed to follow a kosher diet for *religious* reasons, but instead simply asked whether they "would choose the kosher option" if it was "available to [them]." ER53; *see also* ER71-72 (chaplain instructions and survey script).

Next, in order to estimate the total number of inmates in each religious group, Defendants switched their sample and used a very different metric: they tallied the total number of inmates who had "attended at least one religious service" of each religion during the entire year of 2009. ER46. Based on that wildly over-inclusive number, Defendants then concluded that the DOC system contains 1,771 Seventh-day Adventist inmates, and that 36% of them would request a kosher diet. ER54. Using the same flawed techniques, Defendants also concluded that there are a total of 512 Muslim inmates, and that 41% of them would choose a kosher diet. ER54-55.

The bias of Defendants' survey method is obvious: To determine the *rate* of kosher-meal requests among each religion, Defendants targeted religiously "active" inmates, who were hand-selected by prison chaplains due to "their involvement in religious activities and their work with the chaplains," thus making them much more likely than average to request a religious diet. Then, compounding the error,

43

Defendants calculated the total *number* of inmates of each religion based on the over-inclusive tally of how many "attended just one" religious service in the entire year. This dual bias rendered the survey results entirely unreliable: As Defendants themselves admitted, the kosher interest among the small group of hand-selected, highly religious inmates was not "generalizable to the entire population." ER53. And because inmates who "attended just one" religious service "would not be considered 'regular adherents' of that religion," the survey also failed to "reflect the total number of inmates who practice each religion." *Id.* Consequently, Defendants conceded that "it would not be accurate to state that 36% of the 1771 inmates" who attended a single Seventh-day Adventist service in an entire year "would request a kosher diet." ER56.

Defendants' survey accordingly fails to provide any "competent" cost estimate, *Shakur*, 514 F.3d at 890-91, which explains why Defendants asserted a completely different estimate in their brief, which they conjured out of thin air: "Despite the inability of ODOC to definitively predict the number of inmates who would request a kosher diet, it is clear that the number . . . would be substantial. If 100 additional inmates request a kosher diet . . . the cost to ODOC would be $411,720.00 per biennium." ER47. Although the district court repeated that number, ER6, it is entirely made up: It has no basis in evidence, and is nothing more than a smokescreen, obscuring the fact that Defendants failed to provide *any*

meaningful support for their cost projections. The district court thus badly erred in concluding that Defendants established any "compelling interest in limiting kosher diets to Jewish inmates," ER12, much less established it so clearly as to warrant summary judgment in their favor.

Defendants' survey projections are particularly implausible because only 43 Jewish ODOC inmates currently receive a kosher diet, even though all Jewish inmates are eligible to receive one "upon request." ER35. There are more Jews in the adult population than Muslims and Seventh-day Adventists *combined*: the population is 1.9 percent Jewish, compared to 0.5 percent Seventh-day Adventist and 0.9 percent Muslim.[3] This means that the number of Muslims and Seventh-day Adventists requesting kosher meals would almost certainly be lower than the 43 Jewish inmates currently receiving kosher meals. That is especially true because Defendants themselves recognize that Muslims and Seventh-day Adventists typically do *not* believe that their religion requires them to keep kosher—and indeed, despite Defendants' voluntarily providing kosher meals to Mr. McLenithan for the past 7 years, there has been no flood of similar requests from other non-Jewish inmates. In this situation, where the state has already granted kosher accommodations for 43 Jewish inmates, "'[i]t is established in [the Supreme

---

[3] Pew Research Center, Summary Table: Religious Composition of U.S. Adults, http://www.pewforum.org/files/2015/05/Religious-Composition-of-U.S.-Adults.pdf.

Court's] strict scrutiny jurisprudence'" that there can be no compelling need to refuse the rare non-Jewish inmate who might sincerely request the *exact same accommodation*. *O Centro*, 546 U.S. at 433 (quoting *Lukumi*, 508 U.S. at 547).

Finally, the experience of other states confirms that there is no compelling need to deny kosher meals to the few non-Jewish inmates who sincerely request them. *See Holt*, 135 S. Ct. at 866 (holding that the "policies followed at other well-run institutions [are] relevant to a determination of the need for a particular type of restriction" (quoting *Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974)); *Warsoldier*, 418 F.3d at 1000 ("[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means."). Since 2006, for example, Florida's prison system has "ma[d]e it clear" that it "will not refuse to admit a person into the [kosher] Program, whether or not they are Jewish, if they otherwise qualify" based on their sincere religious beliefs.[4] After a full year of that policy, there were only "13" inmates in the entire state with "a religion other than Judaism" who participated in Florida's kosher program. *Id.* In addition, Ohio also manages to "offer kosher meals to Jewish inmates and non-Jewish inmates who require a kosher diet,"

---

[4] Study Group on Religious Dietary Accommodation in Florida's State Prison System, *Final Report with Findings and Recommendations*, at 10 (July 26, 2007), *available at* http://www.becketfund.org/wp-content/uploads/2012/08/JDA-Study-Group-Report.pdf.

without any apparent ruinous effect. *Robinson v. Crutchfield*, 2014 WL 934548, at *1 (S.D. Ohio Mar. 10, 2014). Indeed, Defendants have never claimed that any other state besides Oregon engages in this type of religious discrimination as a means of controlling the costs of religious dietary accommodations, which makes it highly dubious that there is any true "compelling" need to do so.

### 3. Defendants Cannot Prove That Their Discriminatory Policy Is The "Least Restrictive Means" of Controlling Costs

Even if Defendants could prove that cutting off Mr. McLenithan's kosher diet would serve a compelling interest, and even if religious discrimination were a potentially valid means of serving that interest, they could not demonstrate that such discrimination is the "least restrictive" means of controlling costs. There are at least two alternative ways that Defendants could control costs without discriminating against non-Jewish inmates—just as Florida, Ohio, and many other states have already done.

First, Defendants could adopt rigorous procedures to screen inmates for sincerity, which would avoid the asserted problem of "provid[ing] kosher meals to any inmate who claims that his or her religion prefers it." ER44. As the Supreme Court has instructed, "prison officials may appropriately question whether a prisoner's religiosity . . . is authentic," and thus Defendants may limit the kosher diet to inmates whose religion *sincerely* requires it. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005). The Tenth Circuit illustrated his principle in *Beerheide v.*

*Suthers*, 286 F.3d 1179 (10th Cir. 2002), where, ironically, Colorado tried to justify restrictions on a kosher diet by citing the experience of Oregon, which had an initial surge in participation back when it first implemented a kosher program. The Tenth Circuit explained that Oregon's experience was irrelevant "because, when [Oregon's kosher diet] was introduced, it placed no restrictions" on *insincere* requests for kosher meals. *Id*. at 1190. By failing to adopt a proper mechanism to screen prisoners for sincerity, Oregon had adopted a "poorly-designed program" that was "a model of illogic." *Id*. at 1190-91.

This case shows that Defendants remain captive to the same "illogic." They fail to recognize that even if they eliminate their discriminatory policy, they can still limit kosher meals to the very few non-Jewish inmates like Mr. McLenithan who can demonstrate a *sincere* belief that their religion requires them to keep kosher. Indeed, Congress itself has indicated that perhaps the most important means of cost control for prison authorities is to rigorously screen for sincerity in order to weed out "false religious claims that are actually attempts to gain special privileges or to disrupt prison life." S. Rep. No. 103-111, at 11, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1900-01 (1993). But here, Defendants completely ignored the issue of sincerity in their cost-projection survey, and instead simply asked inmates whether they "would choose the kosher option" if it were "available to [them]." ER53. Accordingly, if Defendants *did* screen for sincerity, then even their badly

48

flawed survey would have projected far fewer kosher-diet participants, thus eliminating any need to discriminate on the basis of religion.

Second, even if Defendants could somehow establish that they cannot afford to accommodate the relatively few inmates whose religion sincerely requires a kosher diet, there is an obvious solution to control costs without engaging in religious discrimination: They could simply ration their limited number of kosher meals among qualified religious inmates to ensure that the state's limited resources would have an equal impact on all sincere religious adherents. This alternative would be "less restrictive" than Defendants' current policy, because it would be free of the fatal constitutional defect of "discriminat[ing] against particular religions." *Freeman*, 125 F.3d at 737. Given the availability of that non-discriminatory alternative, there is no possible justification for Defendants to completely foreclose any accommodation for Mr. McLenithan simply because he adheres to the wrong religion.

*         *         *

For all of these reasons, Defendants' refusal to accommodate Mr. McLenithan's kosher diet violates federal law and the Constitution. Because their policy facially discriminates on the basis of religion and imposes a substantial burden on religious exercise, it is triply subject to strict scrutiny under the Free Exercise Clause, the Equal Protection Clause, and RLUIPA. And because

Defendants fail strict scrutiny as a matter of law, the district court should have granted Mr. McLenithan's motion for summary judgment. At the very least, the court's grant of summary judgment in favor of Defendants must be reversed.

## II. Defendants Are Not Entitled to Qualified Immunity For Their Flagrantly Unconstitutional Discrimination

In addition to his claims for injunctive relief, Mr. McLenithan also seeks monetary damages against Defendants in their individual capacities under 42 U.S.C. § 1983 for the nine years in which they unlawfully forced him to defile himself by eating a non-kosher diet in violation of his religious beliefs. Qualified immunity does not shield Defendants from liability because the governing law was "clearly established at the time of the challenged conduct." *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1218 (9th Cir. 2015) (citing *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)). The category of "clearly established law," "includes 'controlling authority in [the defendants'] jurisdiction.'" *Id*. at 1221 (alteration in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see also Hope v. Pelzer*, 536 U.S. 730, 741-45, (2002) (holding that defendants' conduct violated clearly established law in light of binding circuit precedent); *Boyd v. Benton County.*, 374 F.3d 773, 781 (9th Cir. 2004) (explaining that sources of "clearly established law" include decisions of the Supreme Court or this circuit).

Here, Defendants are not entitled to qualified immunity because it has been clearly established for at least four decades that it "violate[s] the First and Fourteenth Amendments" for state prison officials to deny an inmate "privileges enjoyed by other prisoners," "solely because of his religious . . . beliefs." *Cruz v. Beto*, 405 U.S. 319, 322 (1972). That is exactly what happened in this case. Indeed, Defendants themselves have candidly admitted that the very purpose of their policy is to save costs by facially discriminating between traditionally Jewish inmates and other inmates who have a sincere religious practice of maintaining a kosher diet.

In addition, as this Court held just last year, it has been "clearly established" in this circuit since at least 1997 that "inmate[s] ha[ve] the right to a kosher diet" under the Free Exercise Clause if one is required by their "sincerely held religious beliefs." *Jones*, 791 F.3d at 1033 (citing *Ashelman*, 111 F.3d at 677). Indeed, this Court has "held for many years" that "religious-based accommodations, such as providing Kosher diets and disposable utensils . . . are constitutionally required." *Id.* That well-established principle has particular force where, as here, the prison already operates a kosher meal program, and thus has an "obvious, easy alternative[]" that is readily available to accommodate the prisoner's religious exercise. *Id.* In these circumstances, forcing a prisoner to eat a non-kosher diet violates the Constitution because it gratuitously "requires him to defile himself by doing something that is completely forbidden by his religion." *Id.* "These

51

constitutional principles apply with 'obvious clarity' here and provided a 'fair . . . warning' that [Mr. McLenithan] ha[s] a right to abstain from" eating a non-kosher diet, which is "directly violative of his religious beliefs." *Id.* (quoting *Lanier*, 520 U.S. at 271).[5]

In light of this binding authority, Defendants' conduct here was clearly unlawful when Mr. McLenithan was denied a kosher dietary accommodation in November 2000 and for nearly a decade thereafter, based on the avowed discriminatory rationale that "[i]t is the department's policy that only Jewish adherents are approved for Kosher Diet[s]." ER77. Although Defendants began providing him with a kosher diet on a provisional basis after he filed this federal lawsuit in 2009, that still leaves a 9-year period during which he was subject to flagrant religious discrimination and forced to defile himself in clear violation of his constitutional rights—a violation that was particularly egregious since Defendants did not even conduct their *post hoc* "survey" until December 2009. Mr.

---

[5] Other circuits agree. For example, the Second Circuit held over 20 years ago that "prison officials are not entitled to qualified immunity" for "den[ying] [an inmate's] requests for a kosher diet." *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999); *see also Bass v. Coughlin*, 976 F.2d 98 (2d Cir. 1992) (per curiam) (clearly established for qualified-immunity purposes that "prison officials must provide a prisoner a diet that is consistent with his religious scruples"); *Makin v. Colorado Dep't of Corr.*, 183 F.3d 1205, 1211 (10th Cir. 1999) (prison officials' failure to accommodate religious diet violated the Free Exercise Clause); *Johnson v. Horn*, 150 F.3d 276 (3d Cir. 1998) (holding that prison must provide kosher diet based on sincere religious request); *Whitney v. Brown*, 882 F.2d 1068 (6th Cir. 1989) (holding that prison must permit inmates to hold modified Passover Seders).

McLenithan is accordingly entitled to damages under § 1983 for the injuries he suffered in the nine-year period between 2000 and 2009, during which time Defendants did not even *attempt* to justify their discriminatory policy.

## III.    Mr. McLenithan Is Entitled to Summary Judgment Now

In light of the above, the district court should have granted Mr. McLenithan's motion for summary judgment, and that is what this Court should order now. There is no need to remand back to the district court for further factual development, because there is no genuine issue of material fact that remains to be resolved. The district court has already determined that Mr. McLenithan "has established his belief that he must eat a Kosher diet is sincerely held and is rooted in his religious beliefs as a Seventh Day Adventist." ER10. Indeed, Defendants themselves essentially conceded as much, and the extensive factual record does not leave any room for genuine dispute on this point. *See supra* pp. 5-6, 11, 29-30.

Moreover, because Defendants' policy is both facially discriminatory and substantially burdensome, strict scrutiny clearly applies under the First Amendment, the Fourteenth Amendment, and RLUIPA, and there are several reasons that Defendants fail strict scrutiny as a matter of law. First, religious discrimination is not a permissible means of cost control. Second, Defendants' asserted cost savings of one or two percent of their food budget does not qualify as a "compelling" interest. Third, Defendants cannot offer any competent evidence to

53

substantiate their asserted cost savings. And finally, if there were any remaining doubt, it is also clear as a matter of law that Defendants could eliminate their discriminatory policy and still effectively control the costs of religious dietary accommodations through the less-restrictive alternatives described above, just as other states have done.

At the same time, there is no possible factual dispute that bears on the issue of qualified immunity. As this Court held just last year, binding precedent clearly establishes that inmates are entitled to a kosher dietary accommodation when their religion sincerely requires it. *Jones*, 791 F.3d at 1033 (citing *Ashelman*, 111 F.3d at 677). If anything, this case is even more clear-cut, because Defendants have facially discriminated against Mr. McLenithan on the basis of his religion, which clearly violates more than a century of well-established Supreme Court precedent holding that such "pure favoritism" of one "religious" faith over another is entirely "arbitrary, oppressive, [and] capricious," and is thus an unconstitutional "denial of the equal protection of the laws." *Am. Sugar-Ref. Co.*, 179 U.S. at 92.

This case has already been pending for over seven years. The proper resolution is clear as a matter of law, without any need for more factfinding. Accordingly, this Court should order summary judgment for Mr. McLenithan without further delay, and should remand the case to the district court for the entry of injunctive relief and the calculation of damages.

54

## CONCLUSION

For the foregoing reasons, the decision below should be reversed, and the case should be remanded with instructions for the district court to grant Mr. McLenithan's motion for summary judgment, enter his requested injunctive relief, and calculate the damages that should be awarded to him. At the very least, this Court should reverse the grant of summary judgment in favor of Defendants and remand the case for further proceedings.

## STATEMENT OF RELATED CASES

Mr. McLenithan and his counsel are not aware of any related cases pending before this or any other Court.

## CERTIFICATION OF COMPLIANCE

1.     I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,558 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     I hereby certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word in a 14-point Times New Roman proportionally spaced typeface.


Dated:  September 9, 2016                    /s/ Anthony J. Dick
                                                              Anthony J. Dick

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 9, 2016.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  September 9, 2016                          /s/ Anthony J. Dick
                                                                       Anthony J. Dick